**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Josephine Bosco DeRuiter,

        *Plaintiff,*

    *v.*

START Treatment &
Recovery Center, Inc. d/b/a
STARTCare,

        *Defendant.*

---

**COMPLAINT**

**1:24-cv-8207**

**JURY REQUESTED**

Plaintiff Josephine DeRuiter ("Plaintiff"), by her counsel, Harman Green PC, alleges for her Complaint against Defendant START Treatment & Recovery Center d/b/a/ STARTCare ("Defendant") as follows:

## PRELIMINARY STATEMENT

1. This case is about race discrimination against Plaintiff.

2. This case also involves misclassification of Plaintiff as a salaried employee when she worked in an hourly role without any discretionary decision-making authority.

3. Plaintiff is a white woman who raised her right to be free from that discrimination, and then was subsequently laid off.

4. Plaintiff was subject to discrimination and harassment by Defendant based on her race.

5. During Plaintiff's employment, Defendant refused to promote her, despite the fact that Plaintiff was a senior, qualified employee.

## JURISDICTION

6. Pursuant to 28 U.S.C. §1331 this Court may properly hear Plaintiff's claims as they arise under a federal statute.

7. Pursuant to 28 U.S.C. §1367 this Court may properly hear Plaintiff's State and local law claims as they arise out of the same nucleus of operative fact so as to create the same case

1

or controversy.

## PARTIES

8. Plaintiff was and is a resident of New York City.

9. Defendant START Treatment & Recovery Centers, Inc, rebranded as STARTCare℠, has a principal place of business at 937 Fulton Street, Brooklyn, NY 11238, where Plaintiff was employed.

## JURY DEMAND

10. Plaintiff respectfully requests a trial by jury.

## STATEMENT OF FACTS

11. Plaintiff was hired by START Treatment and Recovery Center ("START") in May 2019 as an Assistant in External Affairs.

12. Plaintiff was under the supervision of Rachelle Suissa, the Manager of External Affairs.

13. Defendant START brands itself as "the oldest minority-led drug treatment, non-hospital health, and human services providers programs in the country." As of September 2024, STARTCare℠ brands itself as "a community-focused, Black-founded and BIPOC-operated organization that has been leading the way in delivering care for New Yorkers seeking health support since 1969."

14. During Plaintiff's employment, several senior leaders working for Defendant discriminated against white employees on the basis of their race.

15. Various current and former employees can attest that START's Glassdoor and Indeed reviews were negative and one stated the CEO was and is a racist.

16. For example, Defendant failed to promote Plaintiff, despite the fact that she was qualified for a higher position.

17. Specifically, Plaintiff qualified for the External Affairs Associate/Liaison position because

she acquired her Bachelor of Business Administration marketing degree from Pace University, and had experience in the required marketing skills.

18. In March 2020, Ms. Suissa, Plaintiff's supervisor, was terminated.

19. Defendant's CEO Dr. Lawrence S. Brown Jr spoke to Plaintiff to give her more responsibilities following Ms. Suissa's firing, telling Plaintiff "you're it" when it came to implementing marketing and fundraising functions.

20. Subsequently, Jonnel C. Doris and then Susan Sobers became supervisors to Plaintiff.

21. Despite receiving additional responsibilities, Plaintiff was not promoted or properly compensated for her extra workload.

22. In one instance in January 2021, Defendant's attorney, Benjamin Lipschitz, admitted that he also thought that Plaintiff was "underappreciated and underutilized."

23. In addition to failing to promote Plaintiff, Defendant's supervisors also shut Plaintiff out because she was white.

24. For example, Defendant purposely did not include Plaintiff's image on the organization chart for her role in External Affairs.

25. Plaintiff brought both of these facts to Defendant's agents in the Human Resources Development/People and Culture department, however both times she was ignored and the issues went unaddressed.

26. Starting in November 2022, Plaintiff noticed that her workload was decreasing.

27. For example, Plaintiff was no longer in charge of sending the agency's newsletter, which was a change in job duties as compared to when she was hired in 2019 and in charge of proofing Defendant's Internal Operating Plan and Emergency Operations Plan.

28. Plaintiff told Carson Christian, an agent in the People and Culture department, that her job

duties were being parsed out to others on two occasions — in November 2022 and again in January 2023.

29. Plaintiff's job duties were parsed out to a black intern during mid to late 2023, until said intern was injured, returning some of the workload back to Plaintiff.

30. Despite prejudicial treatment, Plaintiff excelled in her role and received praise from patients and other staff members.

31. For example, Plaintiff made herself available for weekend events such as Defendant's 2023 Pride March, the AIDS Walk, the Back-to-School Drive, and the Holiday Toy Drive, which were all organized or aided by Plaintiff.

32. It came to Plaintiff's surprise then, that in her performance review she was given low scores by CEO Jonnel C. Doris despite her high-level performance.

33. In September 2023, Plaintiff mentioned that her job description did not align with her current duties.

34. She requested an official title change to Manager of External Affairs and a raise, considering that she had a Masters degree.

35. Plaintiff's requests were ignored, and she continued to be shut out.

36. In December 2023, Defendant promoted Susan Sobers, a black woman, to Senior Director of External Affairs and Partnerships.

37. Ms. Sobers was chosen over the Plaintiff, despite the fact that Plaintiff has a BBA Degree in marketing and a Masters in Human Service Leadership, and relevant experience with Defendant.

38. That same month, during a meeting, Ms. Sobers grabbed Plaintiff by the wrist to prevent her from sitting down to participate and provide input in a marketing meeting.

39. Ms. Sobers excluded Plaintiff from the meeting, announcing to the group that they had "something important to do" and that Plaintiff was not welcomed.

40. Ms. Sobers then escorted Plaintiff out of the room.

41. The "important thing to do" was to have the Plaintiff moved out of her office to be placed behind a partition in a shared office until her termination.

42. Plaintiff was also tasked with obtaining signatures from local businesses she frequented for the naming of Dr. Beny J. Primm Way.

43. Despite being successful, Plaintiff was terminated prior to the street naming, and Plaintiff was given no public credit for the work she performed in advancing the project.

44. In January 2024, Defendant's agent Alexis Confer told Plaintiff that she was not getting a raise or promotion and that she still "needed to prove herself."

45. In February 2024, Defendant laid off Plaintiff, stating her position was among the company's widely eliminated positions.

46. This was not true as Plaintiff's position was not eliminated.

47. During the entire period of her employment, Plaintiff was paid a salary.

48. All during her employment, Plaintiff worked in excess of 40 hours per week, sometimes directly working, other times both by working and engaging in work required events.

49. Plaintiff also constantly received text messages 'before and after work hours' that she was expected to respond to.

50. In all, Plaintiff was 'occupied' by work, working, or otherwise could not control her schedule because of work related responsibilities in excess of 40 hours per week without additional compensation.

51. Plaintiff had no independent, discretionary decision-making authority.

52. Plaintiff was also listed as a "non-manager" on Defendant's payroll management service company, ADP.

53. Plaintiff fits into no salary exempt category; she was a community outreach representative, but could not, for example, bind a donor or Defendant to any sort of obligation.

54. Plaintiff could only ever have conversations with others, and bring them to others in Defendant's organization who then did have decision making authority.

55. Multiple coworkers would attest to Plaintiff being underpaid and undervalued.

56. Multiple coworkers also recognized that Plaintiff would work well in excess of 40 hours.

## CAUSES OF ACTION
## FIRST CLAIM

**Race Discrimination under 42 U.S.C. 1981 and the New York City Human Rights Law**

57. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 56 with the same force as though separately alleged herein.

58. Under 42 USC 1981, Americans are afforded the right to be free from discriminatory animus.

59. The New York City Human Rights Law tracks and expands Title VII, which, in turn, relies on the same analysis as 42 USC 1981. As well, the New York City Human Rights Law allows for more liberal pleading and proof standards than under Title VII.

60. The New York City Human Rights Law also allows for individual liability.

61. Plaintiff is a white woman, who was discriminated against and never promoted because she is among the minority of Defendant's employees who are white.

62. Plaintiff's black co-workers were paid more than her and promoted more frequently.

63. If not for Plaintiff's race, she would have been promoted by Defendant.

64. As such, Defendant intentionally and willfully violated Plaintiff's right to be free from discrimination, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

## SECOND CLAIM

**Retaliation under 42 U.S.C. 1981 and the New York City Human Rights Law**

65. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 56 with the same force as though separately alleged herein.

66. Under 42 USC 1981, Americans are afforded the right to be free from discriminatory animus. Likewise, they are afforded protection from retaliation when they complain about race discrimination.

67. The New York City Human Rights Law tracks and expands Title VII, which, in turn, relies on the same analysis as 42 USC 1981. Specifically, the New York City Human Rights Law allows for more liberal pleading and proof standards than under Title VII.

68. The New York City Human Rights Law also allows for individual liability.

69. Plaintiff explicitly complained about being treated differently based on race to members of Defendant's People and Culture department.

70. Plaintiff's complaints were ignored and Plaintiff was shut out of opportunities because of these complaints.

71. Plaintiff was eventually laid off following her complaints.

72. As such, Defendant intentionally and willfully violated Plaintiff's right to be free from retaliation, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

## THIRD CLAIM

**Misclassification as salary exempt and failure to pay overtime, violations of the Fair Labor Standards Act and the New York Labor Law**

73. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 56 with the same force as though separately alleged herein.

74. Plaintiff was paid a salary by Defendant.

75. Under the Fair Labor Standards Act ("FLSA"), an employee may be paid a salary if they fit into a tailored exempt category.

76. The New York Labor Law track and expands the FLSA with respect to overtime payments for workers in the State of New York.

77. Employees, like Plaintiff, are sometimes 'misclassified' – though they do not fit into an exemption category, they are paid a salary.

78. Plaintiff was not properly a salaried employee, and should have been paid an hourly rate.

      Because she should have been paid an hourly rate, she should have been paid overtime for work completed in excess of 40 hours per week.

79. Plaintiff regularly completed work in excess of 40 hours per week, but was never paid her overtime.

80. Because Defendant's conduct was willful and intentional with respect to misclassifying Plaintiff, Plaintiff must be afforded her overtime pay, liquidated damages, costs, expenses, attorney fees, punitive and emotional distress damages, and any and all remedies this Court deems proper.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

B. For the second cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

C. For the third cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements; and

D. For such other and further relief as the Court deems just and proper.

Dated:
October 29, 2024

**HARMAN GREEN PC**

By: _____
Walker G. Harman, Jr.
140 Broadway, Fl 46
New York, NY 10005
(646) 248-2288
wharman@theharmanfirm.com
erichardson@theharmanfirm.com
*Attorneys for Plaintiff*

10